JONATHAN SCHWAB,                          Case No. 14-CV-1731 (PJS/JSM)

              Plaintiff,

                                                    ORDER

v.

ALTAQUIP LLC,

              Defendant.

Benjamin R. Kwan and Kaarin Nelson, HALUNEN LAW, for plaintiff.

Stephanie D. Sarantopoulos and Anthony de Sam Lazaro, LITTLER
MENDELSON, P.C., for defendant.

Plaintiff Jonathan Schwab alleges that his former employer, defendant Altaquip

LLC ("Altaquip"), fired him in violation of the Minnesota Whistleblower Act ("MWA"),

Minn. Stat. § 181.932, after he complained that a coworker had engaged in misconduct.

This matter is before the Court on Altaquip's motion for summary judgment.  Because

the misconduct reported by Schwab did not violate any law, his MWA claim fails, and

Altaquip is entitled to summary judgment.

## I.  BACKGROUND

Altaquip repairs appliances at various locations across the country.  ECF No. 20-1

(Schwab Dep.) at 6, 42.[1]  Schwab worked as an assistant manager at Altaquip's facility

---

[1]Unless otherwise indicated, cited page numbers refer to the pages of documents
as they appear on ECF.

in Minneapolis.  *Id.* at 3.  Much of Altaquip's business is comprised of warranty work that it performs on behalf of retailers.  When a customer returns a broken appliance to a retailer, the retailer delivers the appliance to Altaquip, Altaquip repairs the appliance and returns it to the retailer, and the retailer delivers the appliance back to the customer.  *Id.* at 6.

One of the retailers for whom Altaquip does repair work is Sears.  *Id.*  Altaquip's contract with Sears imposes certain deadlines on Altaquip and imposes certain financial consequences if Altaquip fails to meet those deadlines.  Specifically, the contract provides that Altaquip's performance will be measured against a "Shop Time Metric" of "85% repairs completed in three (3) Business Days."  ECF No. 22 § II.2.a.i.  If Altaquip fails to meet the metric, Altaquip is required to "pay [Sears's] reasonable costs required to provide service within the metrics," including "any amounts required to provide customer satisfaction reimbursement for failure to meet repair time expectations . . . ."  *Id.* § II.1.c.  In addition, the contract penalizes Altaquip by discounting the price it receives for labor depending on how long the repair takes (a 25% reduction if a unit's shop time is more than 15 days, and a 50% reduction if a unit's shop time is more than 30 days).  *Id.* § II.6.a.  Although Schwab did not know the specifics of the contract, he was aware that Altaquip had a contract with Sears and that, under the contract, repairs were generally expected to be completed in three days.  Schwab Dep. at 6-9.

Both Altaquip and Sears are able to track the amount of time that it takes Altaquip to repair a Sears appliance. Sears attaches a barcode to each appliance before the appliance is delivered to Altaquip. After the appliance arrives at Altaquip's loading dock, an Altaquip employee scans the barcode, which enters the appliance into Altaquip's computerized tracking system. Schwab Dep. at 15-18. Moreover, the delivery person from Sears signs a bill of lading confirming that the appliance has been delivered and scanned. *Id.* at 15. As the appliance moves through the repair process, its status is updated on Altaquip's tracking system. ECF No. 20-1 (Rebosky Dep.) at 186-90. Sears has access to Altaquip's tracking system, so Sears can follow the progress of the repairs on any of its customers' appliances. Schwab Dep. at 15-18.

In the fall of 2013, Schwab reported to Altaquip that another manager at the Minneapolis facility—David McCorkell—was manipulating the tracking system. Schwab Dep. at 20. Specifically, Schwab told Altaquip that McCorkell was directing that some appliances that arrived on Fridays not be scanned into the system immediately, as McCorkell did not want to have to oversee repairs over the weekend. *Id.* at 20, 39. It does not appear that Schwab mentioned the Sears contract or any other contract; rather, it appears that he expressed concern that McCorkell was not complying with Altaquip's internal procedures. *Id.* at 21.

Altaquip promptly investigated Schwab's report, and McCorkell was eventually issued a written warning after he admitted that, at his direction, not all appliances had been properly scanned. ECF No. 20-1 (Barber Dep.) at 250-53. Schwab suffered no negative consequences as a result of his report; to the contrary, Altaquip thanked him. Schwab Dep. at 42.

A few months later, Schwab again concluded that appliances were not being handled properly because of McCorkell, and he again complained to his superiors. Schwab Dep. at 22-23. This time, Schwab complained that (1) units were not being scanned "immediately off the truck," (2) there was a failure to "receive [repair parts] immediately" and "match [them] to the specific unit that requires that part," and (3) the units that were first in were not always the units that were first out. *Id.* at 23. Again, Schwab apparently did not mention the Sears contract or any other contract; instead, he appears to have complained of perceived violations of Altaquip's "policies and procedures." *Id.*

Once again, Altaquip promptly launched an investigation—this time suspending McCorkell during the investigation. *Id.* at 25; ECF No. 20-1 (Bonk Dep.) at 233. A district manager flew from Cincinnati to Minneapolis to review delivery records, interview employees, and otherwise investigate Schwab's complaint. Bonk Dep. at 231-36. McCorkell denied any wrongdoing, and, after the district manager's

investigation revealed no evidence of misconduct, McCorkell was exonerated.  *Id.* at 236-39.

On November 22, 2013, Altaquip management called Schwab to tell him that McCorkell would return to work the next morning (a Saturday) and that Schwab was to meet McCorkell and give him a set of keys to the facility.  Rebosky Dep. at 196; Bonk Dep. at 239.  Schwab says that he understood only that he was to let McCorkell into the building.  Schwab says that he did not understand that McCorkell had been reinstated; in fact, Schwab says, he thought that McCorkell would be terminated.  Schwab Dep. at 29-31.  On the evening of November 22, Schwab sent an email to a manager and asked when McCorkell "would be coming in to retrieve his items."  ECF No. 26-6 at 34.  Schwab did not receive a reply to his email.

When McCorkell arrived at the Altaquip facility the next morning, Schwab confronted him and told him to gather his belongings and leave.  Schwab Dep. at 32.  McCorkell says that at one point Schwab physically blocked him in an "aggressive stance."  ECF No. 20-1 (McCorkell Dep.) at 178.  McCorkell told Schwab that he had been reinstated and was returning to work.  *Id.*  Schwab asserts that this confused him, and that he was uncertain about McCorkell's status.  Schwab Dep. at 32.  A standoff resulted.  During the standoff, both men called and emailed management to seek direction.  *Id.* at 34; McCorkell Dep. at 179; ECF No. 26-6 at 35.  As noted, it was early on a Saturday morning, and thus unsurprisingly neither Schwab nor McCorkell got an

immediate reply.  When a manager finally got back to them, Schwab was told that McCorkell had indeed been reinstated and that Schwab should take the rest of weekend off.  Schwab Dep. at 33.

Altaquip investigated the altercation between Schwab and McCorkell.  When Schwab was asked for an explanation for his conduct toward McCorkell, Schwab said that he did not believe that McCorkell was supposed to be at work.  ECF No. 20-1 (Brauns Dep.) at 225-26.  When asked whether he had earlier been told that McCorkell had been reinstated, Schwab did not respond.  *Id.*  Schwab now claims that he said nothing to his superiors about his supposed confusion regarding McCorkell's status because he "really didn't feel the need to."  Schwab Dep. at 50.

Two days later, Schwab was told that he was being fired for violating the company's "code of conduct."  *Id.* at 35; Brauns Dep. at 225.

## II.  ANALYSIS

### *A.  Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## B. *Minnesota Whistleblower Act*

 The MWA prohibits an employer from firing an employee because he "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law . . . ." Minn. Stat. § 181.932 subd. 1(1). A breach of contract is a violation of Minnesota common law, and thus an employee who reports such a breach in good faith is protected by the MWA.

The parties argue vigorously about many things, including (but certainly not limited to) the significance of a 2013 amendment to the MWA that changes the definitions of various terms used in the statute, whether Schwab reported McCorkell's conduct in good faith, whether Altaquip already knew about McCorkell's conduct, whether Schwab was aware of the terms of the Sears contract, whether Schwab's report and the firing were causally connected, and whether the stated reason for Schwab's discharge was pretextual. Yet, even if every one of these disputes is resolved in Schwab's favor, Altaquip is nevertheless entitled to summary judgment for one simple reason: The "violation" that Schwab reported was, at most, a violation of Altaquip's internal procedures, and not a violation of "any federal or state law or common law or rule adopted pursuant to law . . . ." Minn. Stat. § 181.932 subd. 1(1).

The Minnesota Supreme Court has held that "[t]o state a claim under the whistleblower statute, the employee does not need to identify in the report the exact law that is violated, but the conduct reported must at least implicate a federal or state law." *Kratzer v. Welsh Cos., LLC*, 771 N.W.2d 14, 19 (Minn. 2009) (citing *Abraham v. Cty. of Hennepin*, 639 N.W.2d 342, 354-55 (Minn. 2002)). Schwab focuses on the word "implicate," and seems to suggest in his brief that, to be protected by the MWA, he need only have reported facts that, if true, constituted a *possible* violation of the law. When pressed at oral argument, however, Schwab conceded that, to be protected by the MWA, Schwab needs to have reported facts that, if true, constituted an *actual* violation of the law.

This concession was wise, as the Minnesota Supreme Court has rejected—over and over again—the argument that "the reported conduct need only seem, in the eyes of the employee, to be unlawful, even if that conduct is lawful." *Kratzer*, 771 N.W.2d at 21-22. As the court has explained:

> The proper standard to apply when assessing the legal sufficiency of a claim under the whistleblower statute is to assume that the facts have occurred as reported and then determine . . . whether those facts constitute *a violation of law or rule adopted pursuant to law*. . . . In other words, to find protected conduct, there need not be an actual violation of the law. . . because the facts may not be as the employee reported them to be. Although there need not be an actual violation, the law alleged to have been violated must exist. If it later turns out that the facts are not as the employee reported them in good faith to be, the conduct is protected so

> long as the facts, if they had been true, would be *a violation of the law.*

*Id.* at 22-23 (citations, quotations, and footnotes omitted; emphasis added); *see also Obst v. Microtron, Inc.*, 614 N.W.2d 196, 204 (Minn. 2000); *Hedglin v. City of Willmar*, 582 N.W.2d 897, 902 (Minn. 1998); *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 504 (Minn. 1991); *Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 767 F.3d 744, 748 (8th Cir. 2014) ("A report is protected where, assuming the facts reported by the employee are true, they would 'constitute a violation of law.'" (quoting *Kratzer*)).

The problem for Schwab is that, even assuming that the facts he reported were true, those facts did not "constitute a violation of law." *Kratzer*, 771 N.W.2d at 22. In other words, even if McCorkell did everything that Schwab accused him of doing, the jury could not conclude, on the basis of the evidence in the record, that the Sears contract was breached or that any law was violated.

## C. Breach of Contract

Schwab first contends that the facts as he reported them amounted to a breach of the Sears contract. Schwab says that he told his superiors that "policies and procedures [were] not being followed." Schwab Dep. at 22-23. Specifically, he reported that (1) units were not being scanned "immediately off the truck," (2) there was a failure to "receive [parts] immediately" and "match [them] to the specific unit that requires a part," and (3) the units that were first in were not the units that were first out. *Id.* at 23.

But none of this conduct, if true, breached the Sears contract. Nothing in the contract with Sears required Altaquip to scan appliances in a certain way, match repair parts at a certain time, or repair appliances in a certain order. Indeed, it is not even clear that failing to repair 85% of appliances within three business days *breached* the contract; rather, it appears that such a failure merely gave Sears the right to certain financial concessions from Altaquip.

Even if everything that Schwab reported about McCorkell was true, the jury could not conclude that, as a result of McCorkell's "misconduct," any particular appliance had not been repaired within three days, much less that fewer than 85% of appliances had been repaired within three days, much less that Altaquip failed to properly compensate Sears for failing to repair 85% of appliances within three days.[2] As oral argument made clear, Schwab cannot point to any evidence in the record that would allow a jury to find that McCorkell's alleged conduct breached or led to a breach of the Sears contract.

This is not surprising. Sears delivered its appliances to Altaquip, and thus it knew exactly when those appliances were turned over to Altaquip. Moreover, Sears picked up the repaired appliances from Altaquip, and thus it knew exactly how long it

---

[2]The copy of the Sears contract in evidence does not state whether the 85% threshold is measured shop-by-shop or nationally. If it is measured nationally, Schwab's allegations about conduct at the Minneapolis facility fell even further short of establishing a breach of contract.

took Altaquip to repair the appliances.[3]  Sears's knowledge was enhanced by the fact

that it had access to Altaquip's tracking system.  And yet, as far as the record reflects,

Sears never suggested that the Shop Time Metric had not been met or asked for

compensation.  McCorkell's alleged conduct may have violated Altaquip's internal

procedures, and it may even have misled McCorkell's superiors about the efficiency of

operations at the Minneapolis facility.  But there is no reason to believe that anything

McCorkell did misled *Sears* or resulted in a breach of the Sears contract.

Schwab argues that it is irrelevant that he did not accuse McCorkell or Altaquip

of breaching the Sears contract, but instead accused McCorkell of violating "policies

and procedures."  That is true, but that is also beside the point.  Schwab's problem is

not that he did not *characterize* McCorkell's conduct as breaching a contract; Schwab's

problem is that there is no evidence that McCorkell's conduct *breached* a contract.

### D.  Fraud

Schwab next contends that if McCorkell had done what Schwab accused him of

doing, McCorkell or Altaquip would have committed common-law fraud.  According to

Schwab, the improper scanning that he reported was meant to fudge the repair statistics

in order to fool Sears into continuing to do business with Altaquip.

---

[3]It is not clear from the record whether the drivers who transported appliances to
and from Altaquip were employees of Sears or independent contractors hired by Sears.
It does not matter.  Either way, the drivers were agents of Sears, and Sears knew what
they knew.

To establish a claim for fraudulent misrepresentation under Minnesota law, a plaintiff must show, among other things, that the party on whom the fraud was perpetrated "suffered pecuniary damage as a result of . . . reliance" on the misrepresentation. *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (quoting *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)). Schwab says that if his allegations were true, Sears would have been entitled to compensation under the contract for Altaquip's failure to meet the required metrics, but, because of the allegedly deceptive scanning, Sears was not aware of its entitlement.

As the Court has already explained, there is no evidence in the record that Altaquip failed to meet the required metrics, much less that Altaquip lied about failing to meet the required metrics, much less that Sears (who, again, knew exactly when each appliance was dropped off and returned) relied on Altaquip's lies to its detriment. Without such evidence, a jury cannot find that McCorkell's alleged conduct constituted common-law fraud.

### E.  Minnesota Deceptive Trade Practices Act

Finally, Schwab contends that if McCorkell had done what Schwab accused him of doing, McCorkell or Altaquip would have violated the Minnesota Deceptive Trade Practices Act ("MDTPA")—and, in particular, the Act's prohibition against untruthful "represent[ations] that goods or services are of a particular standard, quality, or grade . . . ."  Minn. Stat. § 325D.44 subd. 1(7).  But Schwab did not raise this contention

until he filed his brief in opposition to Altaquip's summary-judgment motion. Schwab's complaint makes no reference to the MDTPA (even though it explicitly invokes breach of contract and fraud), and Schwab never gave Altaquip any indication that he was contending that McCorkell's alleged conduct violated the MDTPA. Unsurprisingly, then, the parties did not pursue discovery on issues relevant to the MDTPA, whose elements differ from the elements needed to prove breach of contract or common-law fraud. *See generally Baker v. Sunbelt Bus. Brokers*, No. A07-0514, 2008 WL 668608, at *5-6 (Minn. Ct. App. Mar. 11, 2008) (explaining purposes and requirements of MDTPA).

As the Eighth Circuit has made clear, a party is not "entitle[d]" to "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *N. States Power Co. v. FTA*, 358 F.3d 1050, 1057 (8th Cir. 2004). That is precisely what Schwab has done here. The Court will not consider his argument regarding the MDTPA.

In sum, no jury could find, on the record before the Court, that McCorkell's alleged conduct breached any contract or violated any law. Schwab's report was therefore not protected by the MWA, and Altaquip's motion for summary judgment is granted.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Altaquip's motion for summary judgment [ECF No. 17] is GRANTED.

2.      Schwab's complaint is DISMISSED WITH PREJUDICE AND ON THE

MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 28, 2015                          _s/Patrick J. Schiltz_____
                                                 Patrick J. Schiltz
                                                 United States District Judge